We will hear argument this morning in Case 21-1484, Arizona v. Navajo Nation and the Consolidated Case. Mr. Liu? Thank you, Mr. Chief Justice, and may it please the Court. When a reservation is established, that reservation isn't just the land. It's also a right to the timber on the land, a right to the minerals below the surface, and under winters, a right to water for the reservation. Each of those rights is a stick in the bundle that makes up the reservation, and when the Navajo Reservation was originally established and later expanded, the Navajo Nation got all of those sticks, and it still possesses them today. There's no dispute about that. The dispute here is about something different. Whether the United States owes the Navajo Nation a judicially enforceable affirmative duty to assess the tribe's water needs, develop a plan to meet them, and then carry out that plan by building water supply infrastructure on the reservation. The answer to that question is no. Just as the 1868 Treaty didn't impose on the United States a duty to build roads or bridges, or to harvest timber, or to mine coal, the 1868 Treaty didn't impose on the United States a duty to construct pipelines, pumps, or wells to deliver water. Those affirmative duties aren't part of the Treaty, and because the government has never expressly accepted those duties, the Navajo Nation's breach of trust claim can't proceed. This is not to say that the United States doesn't have a moral and political responsibility to address the Navajo Nation's water needs. As part of the general trust relationship, Congress and the Executive have secured for the Navajo Nation hundreds of thousands of acre-feet of water and over a billion of billions of dollars for infrastructure on the reservation. And in exercising its own sovereignty, the Navajo Nation is free to develop its own infrastructure projects, including by drilling water to access the cheapest source of water on the reservation, groundwater. What the Navajo Nation cannot do, however, is to impose on the United States a duty that the government has never expressly accepted. According to the judgment, the law should be reversed. I welcome the Court's questions. Mr. Liu, would you just take a step back and address the jurisdictional issue, particularly with respect to redressability and this Court's retention of jurisdiction on the Colorado River? Sure. We don't view the issue as going to the District Court's subject matter jurisdiction. We view it as a substantive merits determination about whether the relief that could be granted at the end of this suit would violate the substance of the the relief that could be ordered down the road and measured against the decree. I think everyone at this point agrees that an order by the District Court in this case that would order the delivery of water from the lower mainstream of the Colorado River to the Navajo Reservation would violate the decree because the decree places conditions on when such water can be delivered by the United States. Where else would the water come from? There's plenty of sources on the Navajo Reservation so if we're talking about the particular region of the Navajo Reservation, that's an issue in this complaint. The most accessible source of water on the reservation is groundwater. There are aquifers that lie beneath the reservation and there's no impediment to the Navajo Nation accessing those water sources today. In fact, they're doing it across other parts of the reservation. Another source of possible water for this region is the upper basin, the Colorado River in the upper basin. That upper basin water is farther away than the lower Colorado mainstream but it's far more accessible and the reason why is if you look at the terrain of the lower Colorado mainstream that's adjacent to this part of the reservation, it is a steep canyon. The reservation is on a plateau and then it's a 3,000 to 4,000 foot drop down the canyon to the lower Colorado River. You said that water was farther away. How far away is it? It still borders the reservation but it's further north. It's just above Lee Ferry. The area we're talking about here is below Lee Ferry so it's not much farther. Yeah, I'm sorry but how far away from the agricultural areas where water is needed? Well, I think to be clear, the water needed here isn't for agricultural needs. If you read the complaint at JA 101 to 102, the needs there alleged aren't agricultural needs. They are domestic municipal needs and I think that just highlights the mismatch between the needs here and the agricultural provisions that are relied upon in the 1868 treaty. The 1868 treaty provisions are about farming. They are about providing seeds and agricultural implements to the tribe in the original part of the reservation. The needs alleged in the complaint exist hundreds of miles away and they're not even about agricultural needs. They're about needs for domestic and municipal consumption. If you look at the text of the treaty, this is reproduced at 11A of our appendix, the provisions that issue, this is article seven of the provision, they're about particular items, seeds and agricultural implements for a particular area, the tracts of land that were selected in the original reservation. They're for a limited period of time, up to three years, and they're for a particular amount, $100 the first year, $25 the second and third. The duty asserted here is about something else. It's about water. It's about water for a different part of the reservation, 100 miles away. It's about water for an ongoing and indefinite basis, not for a limited period of time, and the dollar amount, there's no limit. I think part of the problem, the separation of powers concerns that the claim raises is that it's really unclear what the scope of the plan that the Navajo Nation envisions the United States will design will look like at the end. Mr. Liu, I think you said that the Navajo Nation has quote hundreds of thousands of acre feet of water, is that correct? Correct. Do you have a figure for how much water that is? It is, well, an acre feet is how much water would fill up an acre of land one foot. Right, right. And you know, we could... Do you know how many hundreds of thousands? Do you know the amount of... Has the United States calculated or could you calculate water per capita? I don't have water per capita, but to give you some examples, the San Juan settlement in New Mexico provides 37,000 acre feet annually. You know, this covers 250,000 people over a 40-year time horizon. The appropriations associated with that are $1.9 billion. So that's sort of the magnitude of 300 miles of pipeline, 19 pumping plants, two water treatment facilities. So these are substantial facilities that the government in furtherance of its general trust relationship has agreed to provide. But I understood that that was part of the Navajo's argument in this case. In other words, you say here that you don't have calculations about water per capita. And I understood that their breach of trust claim was about that, was about the fact that the United States, they say, has not done what it needs to do as a trustee to determine what their water needs are. And I would say that there's no duty, no specific duties found in the treaty that requires us to conduct that sort of analysis. Mr. Liu, with respect to that, there are provisions in the treaty with respect to agriculture, a promise that this will be a permanent home and that there will be opportunity for raising animals, right? Correct. Is it farm and raise animals without water? No. And could the United States dam the little Colorado right above the reservation and prevent water from flowing into the reservation? It could do that as a matter of fact. Well, as a matter of fact, right? But it's a matter of law. Could it do that? No. Because that would breach the treaty obligation, right? If the tribe were making use of the water, then it would breach, it would interfere with their exercise of their winter's rights. Okay. So clearly there is a duty to provide some water to this tribe under the treaty, right? No. Wait, hold on. What am I missing? We just agreed you can't dam the little Colorado because that would breach the treaty, right? That's water, right? Correct. So there's some obligation with respect to water in this treaty. There is an obligation to respect their winter's rights, just as any other landowner would have to do. But the difference here is- And there's an obligation to provide opportunities for a permanent home. Now, let's say as a matter of state contract, I promise you a permanent home and that you'll be able to raise animals there and you'll be able to conduct agriculture there. Would it not be a breach of contract to then provide a home where none of those things is possible? Is that a permanent homeland comes with the bundle of sticks that I said at the outset? One of those- If you just answer my question, could I bring a good breach of state contract claim for someone who promised me a permanent home, the right to conduct agriculture and raise animals, if it turns out it's the Sahara Desert? I don't think you would be able to bring a breach of contract claim. Really? You don't think that's a breach of good faith and fair dealing? You don't think at least it would state a claim? I don't think so. And I'm happy to apply- If we disagree with that, then what? If we found that that might, under ordinary contract principles, state a claim. And in fact, many state courts have found such claims. If this court thought the Hickory Standard were satisfied, then there would be a judicially enforceable duty and we'd move on to the second step of the analysis. And with respect to that second step, or maybe it's the first, I don't know, the jurisdictional question, you agree that the trust claim brought here is not the type of question that must be addressed before addressing whether the Navajo Nation has identified a judicially enforceable duty, right? We don't think the jurisdictional issue needs to be addressed before. We don't think it's a jurisdictional issue. Correct. Mr. Lew, I guess I'm just not You start by saying that the Indians have rights to water and that they get them by virtue of having rights to land, having a reservation of this kind, and the rights to water just go along with that. Is that a matter of the treaty or are you saying it's something else, that the rights arise some other way? It is a matter of the treaty setting aside the land for the Indians. Okay, so if it's a matter of the treaty, if you read the treaty as giving rights to water, right? Because you could read the treaty and say, I don't see anything about water here. There are no rights to water, but you're not reading the treaty that way. You're saying, look, when the treaty gives land, the treaty also says, you know, implicit in that is that you have a right to the water that will enable you to live on that land. So then there seems to me to be a gap because then you're saying, well, notwithstanding that the treaty gives water, that the treaty promises water, that's what treaties do. It's a contract that promises something. You're saying those rights are unenforceable. And I guess I don't understand if the treaty promises water, where you get the idea that that is unenforceable. No, the treaty does vest water rights in the tribe, and those rights are enforceable, including by the tribe. But the promise that we have allegedly breached here isn't about violating those rights. It's about violating affirmative duties to supply the water to the tribe. It's just like my minerals. I guess I'm not getting it. If there's a contract and the party, then just by the nature of how rights work, it gives a duty to the other party. So there's a contract here and it gives a right to the Navajos. You say so yourself. That means it puts a duty on the other party to the contract, which is the US government. The right that is conferred by the by the reservation of the land is a right to use the water and to exclude others from using it, just like it's a right to use the minerals or to exclude others from using it, just like it's a right to use the land or to exclude others from using it. So you're saying that we should read this contract as giving the tribes rights, but only as against third parties? Well, it is against the government because we can be liable for taking their land, for taking their timber, and for taking their water. But the rights themselves are property rights. They are sticks in a bundle that the tribe got. What they're asking for now is for us to help them use all of those sticks in the bundle, for example, by building the plants, the pipelines, the wells, etc. So you're saying that this contract obligation that you read into the treaty, it's just the US government saying, we won't interfere with your ability to get water. But the US government did not say, in giving you this land, we are also promising you that we will do what's necessary to make the land livable. That is correct. That is correct. What the reservation conveys is a set of property interests. And by their nature, those property interests allow the tribe to use and exclude, but by their nature, they don't impose on the United States new duties. Thank you, counsel. Justice Thomas? Mr. Liu, is there a difference in your answer for pre-existing access to water on the land, as opposed to the need to bring water to that land? It is a difference between the right to use the land, whether it's pre-existing or not. They can be new. I think what I'm trying to get you to focus on is, if I hear you, you're saying that the government and third parties cannot interfere with water on the land. Correct. But you also said you have no affirmative duty. So my second question is whether or not you – it could be argued that by providing a permanent home, you are required to bring water to land where there is no water. No. We do not understand the permanent homeland language to convey that sort of duty. And I think it would be surprising to those who entered into the treaty if that were such a promise. The whole point of the treaty was to allow the Navajo Nation to return to their ancestral homeland where they could support themselves. Justice Alito? Well, I wanted to pursue the questions that I asked about some of the real-world impacts of what's at stake here. So I asked about the total amount of water that has been supplied to the Navajo and whether there's a per capita calculation. I gather you don't have that. I don't have a per capita. Can that be supplied to us? Yes, we could supply that. And how would – if that were calculated, how would it compare to water per capita for the residents of, let's say, Arizona? It may well be less. I think no one denies that there are water needs on the reservation. If I had been shown a seat-at-the-pants calculation, that per capita water on the Navajo Nation is greatly in excess of per capita water for residents of Arizona, do you think that would be incorrect? Honestly, I don't have a basis to know whether that's correct or not. Is there anything in the view of the United States that is distinctive about this treaty as opposed to many other treaties entered into between the United States and other Indian tribes with reservations adjacent to bodies of water? No. There's – the provisions in particular that the Navajo Nation has relied upon are not, in our view, distinctive to this treaty. There are many – I mean, most treaties set aside a reservation that is intended to be permanent homeland, and many treaties also have provisions that supply support for agriculture. So if this court were to conclude that there were judicially enforceable duties that arose out of provisions like that, I think we would be facing similar suits across reservations in the country. What would be the nationwide impact of such a ruling? Well, there are 500 or so tribal reservations. The government has entered into about 30 or so water agreements since the late 1970s. There's ongoing litigation in courts across the country. I think this would impose on the United States a sort of amorphous duty to take another look at all those issues. What would be the impact on access to water by people who don't live on reservations? Well, I think because the Indian water rights has this powerful preemptive effect, which is that it has a priority date that is no later than the date of the reservation, and that the right to use the water can't be lost by virtue of non-use, it could have an effect on water use by other entities. In 1868, was the reservation adjacent to the Colorado River? It was not. The 1868 reservation straddled the New Mexico-Arizona border, which is hundreds of miles away from the lower Colorado River mainstream. So if we are looking at the expectations of the treaty parties, do we look at what their expectations would have been in 1868, or at the time of the expansion of the reservation subsequently? We look to the 1868 time frame, and in that time frame, what they were thinking about was the land set aside for the original reservation, not the land that's at issue today. Where would they have accessed water in 1868? In 1868, on the original reservation, much of that area lies within the little Colorado River basin, and there are washes that come off the main little Colorado River that would have been sources of water. There was groundwater. They could have impounded water. So, you know, springs, lakes. You agree that the tribe has reserved water rights, correct? Correct. All right. You agree that the U.S. has a trust over that water for the Indians, don't you? Correct. We hold it in trust. You hold it in trust. Correct. And in fact, in the Arizona litigation, the Navajo tribe wanted to intervene, and you said you can't because we represent your interests, correct? Correct. And they can't assert rights in their own name because you hold it in trust. So, you not only control it, but you're the only one who can assert their interests. Is that correct? That's not true as a general matter, no. Why? They tried to intervene in Arizona, and you said you can't because we're the trustee. In that particular case, we oppose intervention, and the court agreed and denied intervention. But as the court has since made clear, including in Arizona versus California itself, tribal participation in water rights disputes shouldn't be discouraged. And so, it is the norm. They could, but they can't start it without your approval. It depends on what they're starting. There's nothing that requires our approval to bring a suit in federal court. They can make their own priority calls for administration once their rights are quantified. They can bring Tucker Act claims against the United States if we interfere with their use of water, and they can assert their own winters claims in ongoing stream adjudications as they are doing now in the Little Colorado River Basin. But what you're saying is your trust obligation is meaningless. They can't force you to do anything to protect their water rights. That's what you're saying, correct? Well, the nature of the trust obligation we have with respect to the water rights is the same trust obligation we have with respect to the land. And in Mitchell 1, this court addressed that obligation and said it was only a bare or limited trust, and did not bear the hallmarks of a conventional fiduciary relationship. And so, you don't think there's a fiduciary relationship here at all? Not that it's judicially enforceable. Well, that's quite an odd agreement the tribe entered into, isn't it? They agreed to go back to a piece of their homeland and gave the United States control over the vast majority of it. They agreed to sit to a land that would permit them to return to agriculture, and the bargain they got in return was, we, the United States, took away all of your other lands. We gave you this piece of land. Here, survive, even if it turns into a desert condition where you admit there are significant water needs on the reservation, but the tribe can't do anything about it. Can't hold you responsible. I guess two quick points. One is, we're maintaining the same relationship with respect to the express reservation of land as we are to the implied reservation of water. And I think it'd be strange if the express reservation of land did not give rise to affirmative duties, but the implied reservation of water did. But what you're talking about is, and a lot of your criticism of the remedies that a court can or can't order, I think are different from the question of, are there any remedies? It seems to me you yourself are agreeing that there could be litigation over whether there are sources of water that could be made available from tributaries and not violate the Arizona consent decree. So I don't know why we should say there's no cause of action here, merely because there are some remedies that you think exceed your obligations. Well, we don't. And others don't. It appears to me that if there are sources of water that you could litigate about and secure for the use of the Navajo Nation without building pipes, that that might be something that, in fact, there is no defense against. We don't think there's any available remedy here because we don't think there's any judicially enforceable duty in the first place. And that is irrespective of the scope of the decree in Arizona versus California. But I do want to address the sort of historical account of what happened. It's absolutely true that the United States forcibly relocated the Navajo Nation in 1863 to an area called Bosque Redondo. And five years later... And in that land, they couldn't farm. There was drought conditions. And for at least three seasons, they were not able to grow any food. Correct? And then the U.S. wanted to put them someplace else, and they insisted on returning to a part of their native homeland. It's true that the crops at Bosque Redondo failed, but I think it's important to understand why they failed. It wasn't because they alleged that the United States had a duty to provide water and we weren't providing it. It was because there was alkaline in both the soil and the water. And so when the Navajo and General Sherman met in May of 1868, the Navajo Nation's request was to be able to return to their ancestral homeland where they could live as they did in the status quo ex-ante before they were forcibly relocated. And if we look at the status quo that they wanted to be returned to, it was a status quo in which they could support themselves. It was not a status quo in which the United States was supplying the Navajo Nation with water or water infrastructure. Justice Kagan? I'm sorry. Justice Gorsuch? You emphasized that they got the bundle of sticks, including water, right? Correct. Their water rights with respect to the Colorado River had never been adjudicated, right? Correct. And that's because the government opposed their motion to intervene in Arizona versus California, right? No, I don't think that's quite right. Because if you look at the motion for intervention that they filed, they weren't seeking intervention to make claims in the lower Colorado mainstream. They raised five grounds as to why the United States' representation was inadequate. This is reproduced at JA 106 and 107. Not one of them is about a failure to seek water in the mainstream. At the time of that litigation, the irrigable acreage on the Navajo reservation was understood to exist within the drainage basin. Mr. Liu, I think we're talking across purposes. Okay. You agree they have a bundle of rights, whatever they are, with respect to water. Correct. They may or may not include some portion of the mainstream of the Colorado. Nobody knows, right? Correct. Because the government opposed the motion to intervene to allow them to participate in that litigation. They weren't looking to participate to assert those claims. Well, nobody's ever litigated them, and you assert the exclusive right to litigate them on behalf of the Navajo. That's not true. Do you think the Navajo could now intervene in Arizona versus Colorado? They could file a motion to intervene. Do you think they could intervene? Would the government oppose it again? We might oppose it, but it's not on grounds that they can't have their own voice. We might oppose it because of merits or collateral estoppel issues, but not because we don't think tribes should be able to participate in a bundle of sticks that remain unadjudicated and that the United States government opposed their participation to adjudicate. That's where we sit. I think the government opposed it, and frankly, the court agreed with the merits of our opposition. Our filing an opposition... The ultimate consent decree specifically says that it doesn't resolve the rights of any Indian tribe except as expressly provided in the consent decree, and that does not include the Navajo, right? Correct. I think that's partly why the Navajo can bring a motion to reopen the decree if they want to. Well, except for you're going to oppose it again. You just made that clear... I don't know if I'm going to... So what remedy do they have other than to say, okay, if you're going to assert the right to control that litigation and adjudicate our bundle of sticks, we can at least pursue litigation to try to force you to do that. I'm not saying we would oppose it or not. I'm just saying we'll make that determination based on the substance of the motion, but the point is we do not control what the Navajo nation does with its water rights. They can vindicate them on their own. They are a sovereign nation. Justice Kavanaugh? Pick up on Justice Alito's questions from earlier and ask you about assertion made in the amicus brief of the Western water users and just to get the United States assessment of them. That amicus brief says the reduction of available water would necessarily come at the expense of existing allocation holders, particularly from the Central Arizona Project, which delivers water to 80% of the state's population. This amicus brief says that would have severe negative consequences for Arizona, its businesses, its agricultural and industrial sectors, and would strike at the heart of the social and economic livelihood of Arizona with dire consequences. I'm not saying I agree with that. I just want that's an assertion in the amicus brief. I want your assessment of the implications. Yeah, it is true that basically all the water in the lower basin is allocated, and I guess to respond to that directly, Congress has set aside in the 2004 Arizona Water Settlements Act 6,411 acre feet of water for a future water settlement out of the Central Arizona Project for the Navajo Nation. That is water that would require additional congressional action to allow the Navajo Nation to use. If they were to use that water, it wouldn't affect, I don't think it would affect necessarily all the other users, because that's water that's already been set aside. And so I think the fact that Congress has done that just reinforces where this dispute belongs. It doesn't belong in the courts. It belongs in front of the political branches, which have focused on these sorts of issues. A different tack. The Ninth Circuit decision is barely defended by the Navajo Nation. What should we do with that? I mean, one option sometimes is, well, we'll just send it back to the Ninth Circuit because none of the arguments that persuaded the Ninth Circuit are being re-upped here. Right. I think the only issue that's really in dispute at this point is the interpretation of the 1849 and 1868 treaties. And we would urge the court to decide the issue of that interpretation. For all the usual reasons, this court decides issues because it was addressed below, Pet. Act 31. The Ninth Circuit did address these provisions of the treaties because the issue has been fully briefed here, because it is a purely legal issue, and frankly, because we think the issue is straightforward. Thank you. Justice Barrett? Mr. Liu, the United States asserted winter's rights on behalf of five tribes in Arizona versus California. Why didn't you assert winter's rights on behalf of the Navajo? Because when we looked at the evidence of where the Navajo had irrigable acreage, all of that acreage existed in the Little Colorado River Basin, which is a tributary of the lower Colorado and not in the part that would be supplied by the lower Colorado itself. So you made the determination that they did not have winter's rights in the mainstream? Yes, at a time when the applicable standard was practically irrigable acreage. And to clarify your interchange, your position and your interchange with Justice Gorsuch, you might oppose. You can't commit the United States to what they would do. But you're saying that, in your view, nothing stops the Navajo now from seeking to intervene and assert their own winter's rights in Arizona versus California. Correct. They can make that request. Do you see winter's rights as something that belong to the Navajo or something that belong to the United States that United States protects on behalf of the Navajo? We view the winter's rights as belonging to the Navajo. They are the beneficial owners. The United States merely has legal title and holds those in trust. But we view the Navajo as the owners, as they own the land, the minerals, the timber. Okay. Earlier, I think maybe in response to Justice Alito, you said that there would be groundwater and other sources and aquifers underneath the reservation that the Navajo could use to supply their water needs. Correct. Why then would this necessarily be – why would resolving this dispute be at odds with the decree? Because it sounds to me like what you're saying is that they could get water from places other than the mainstream. Right. I think there are ways to resolve this suit without violating the decree. Even if the court believes there is a duty, there are forms of relief that are short of ordering a delivery of water from the lower Colorado to the Navajo Nation. And so long as the decree, I think of – I mean, so long as the relief here avoids that sort of relief, I don't think the decree is – So the decree, in part, is kind of irrelevant. In the United States' view, it comes into play only if they're seeking a particular type of relief. Okay. And then last question. I'm having trouble conceptually thinking of this, trying to decide whether this feels more like a breach of contract claim for breaching the treaty or a breach of trust claim. Because in a breach of trust, and when you look at the line of cases that are at dispute here, like say timber or mineral rights, those kinds of things, you're looking at a race. You know, there's actually – there's mineral rights, there's timber, et cetera. And here we're not looking at a race. So it seems to me more, and the strongest arguments – and I think you've heard some of that today – seems to me that the strongest arguments made on behalf of the Navajo in the Navajo's brief are in the nature of you breached the treaty. It was broken promises. You promised us a permanent home and you're not – is there a claim that the Navajo could have brought for breaching the treaty? It just doesn't seem to me to fit very neatly in the breach of trust model. I fully understand the point. I think there is an overlap between a treaty claim and a trust claim. I think both of them, if you're going to base them on the treaty, overlap in this way. To prove up either claim, you would need to point to an actual duty that exists in the treaty. Whether you want to say it's a breach of treaty or a breach of trust, you at least have to show that. Now, I think where the difference lies is if the Navajo Nation wanted to take advantage of common law trust principles – for example, if they wanted to hold us to a duty of prudence or a duty of loyalty – then they'd have to prove something more than just any old treaty duty. They'd have to show that that duty also bore the characteristics of a conventional fiduciary relationship. And to just draw a comparison, I think the earlier cases like Mitchell I and Mitchell II, if you look at the statutes in those cases, they say something like the government will hold the timber in trust and will have the responsibility to manage them. There's nothing in there about a duty of prudence or loyalty or anything like that, but because that type of duty looks like a trust duty, you can use the common law to flesh out those duties. Contrast that with a promise in this treaty, which is something like we will give you seeds for up to three years. That is a duty, and we agree that under today's legal regime, it would be enforceable as a treaty duty. But I don't think it would be a trust duty, because a promise to give someone seeds doesn't bear all the hallmarks. Okay, so what – but I think it matters how we think about it. I mean, and I guess my first question is, would there be a cause of action? Could they bring a breach of contract, breach of treaty claim, if that's how they had wanted to style this cause of action? Yes, they could have brought a breach of treaty claim. And if they brought a breach of treaty claim, we would be talking about a different set of legal rules, because presumably all of these rules about explicitness would not apply, because we would be thinking more about benefit of the bargain and expectation of the parties, and so we would be using a different legal framework, right? Well, I don't think you necessarily would. We understand the Hickorya standard to simply say to courts, don't make up the duties, look at what the political branches have done. If you're talking about trust? I think if we're talking about really any duty, because I think the overlapping element that both a treaty claim and a trust claim have is that there must be some actual duty in the treaty. I agree, but for treaties, we construe them in favor of the Indians. For the trust, when we're looking at trust principles in the Hickoryla line, we're talking about, no, you have to have something that's very express, and that's at odds with construing the document in favor of the Indians, right? Well, we don't read the express acceptance language in Hickorya as imposing a clear rule. We read that as saying, look at the words that the political branches have enacted in a statute, treaty, or regulation. We then think you apply the usual tools of interpretation to those words. So in the case of a treaty, you can apply the Indian canons. Now, all the Indian canons are themselves about how to interpret words. This Court has made clear that even beyond their clear terms. And so even applying those very favorable canons of interpretation, I don't think that gets the Navajo Nation anywhere. They haven't pointed to any ambiguity in any of the language of the treaty, and the treaty terms at issue are about seeds and agricultural implements, which everyone agrees are about seeds and agricultural implements. Okay, so just to make sure that I understand, you don't think that they've brought the wrong cause of action. Do you think that a contract or this treaty could have established a trust? It feels odd to me because there's not a race, but you're saying it could have, but it's just that the language in this treaty fell short of doing that. Correct. Okay, thank you. Justice Jackson? Can I go back to Justice Kagan's question? Because notwithstanding the fact that the treaty doesn't have the express terminology that you were just exploring with Justice Barrett, you've also said here in previous litigation and your practices indicate that the Winters right that belongs to the Navajo is being held in trust by the United States. So to the extent that Winters looks at treaties like this and says there is a water right, the United States concedes that it has a trust relationship with respect to those water rights. So what I don't understand is why we don't have a simple breach of fiduciary duty kind of scenario where anyone who has a trustee controlling their interests can come to court and say the trustee is not doing what it's supposed to do in terms of those interests. I just don't understand why that's not where we are in this case. It's because of the distinction this court has drawn starting in Mitchell 1 and then reaffirmed in the Navajo cases and then reaffirmed again in Jicarilla that a bare or limited trust isn't enough to give rise to judicial... All right. So I thought you were going to say that. So let me explore those with you. All right. I read Mitchell, Navajo 1, Navajo 2, and Jicarilla to all be Tucker Act cases. Do you concede that there was a Tucker Act issue going on in those cases? They were all underlying Tucker Act suits. All right. And so the cause of action and the right to sue because of sovereign immunity was arising under the Tucker Act. You needed to satisfy the Tucker Act in those cases. And it's the Tucker Act that gives rise to this positive source of law requirement, right? I mean, that requirement is in the Tucker Act and anybody who tries to sue the federal government for damages under the Tucker Act has to point to a specific positive source of law. But to the extent that this is not a Tucker Act case, I don't understand why we care whether or not there's a positive source of law. This is not like Mitchell, Navajo, Jicarilla. We don't have that responsibility because we're not trying to waive sovereign immunity under the Tucker Act in this way. Well, I think this court's cases make clear that, yes, the Tucker Act references the same positive sources of law, but that this is a requirement that goes to whether a judicially enforceable duty exists in the first place. Why? Why? But it doesn't in any other fiduciary duty context, right? If this was a regular fiduciary duty case, you would not be here arguing. This didn't involve Indians and it you would just say, okay, let's talk about whether or not we actually have a fiduciary duty under common law or whatever. But you seem to be getting this positive source of law thing from the Mitchell Act cases and those cases, I think, don't apply. Well, Jicarilla itself, while it was an underlying Tucker Act suit, the relief sought there was actual relief. Yeah, but Jicarilla wasn't even about whether or not there's a cause of action for a breach of fiduciary duty. Jicarilla, everybody agreed, you know, this, excuse me, in Jicarilla, unlike this case, there was no agreement about the extent of the fiduciary obligation, right? I understood that case to be a dispute over whether or not the United States took action and used the exception to attorney-client privilege, right? It was about documents. And the United States said, okay, you know, you want to try to get access to these documents under the fiduciary exception to attorney-client privilege, but we're really not acting as a fiduciary. And the court agreed. All right, that has nothing to do with, I think, what is at issue in this case where you agree that you have acted as a fiduciary, that you are a fiduciary in the sense that you hold the rights and trust. So we've already taken care of the Jicarilla issue as to whether or not you're a fiduciary. The question here is whether there's a cause of action by the Indians to sue you for breach of that fiduciary. And here was Jicarilla's reasoning. The government is a sovereign, not a private trustee. The government, because it's a sovereign, can structure the trust relationship to serve its own policy goals. As part of that discretion, Congress can shape the relationship so that it is just a bare or limited trust, so that it is not taking on all the fiduciary duties that would go along with the private trustee. All right, but is there any real dispute here that the government understood its trust obligations to be to assert winter rights and to make sure that, as Justice Gorsuch pointed out, the Navajo had enough water? I mean... Yes, that is absolutely in dispute. So can I just ask you how so when the United States has asserted these winter rights in at least, with respect to the Navajo Nation, in at least three different actions outside of the Colorado mainstream, when it's represented various tribes in the original Arizona versus California litigation, when it obtains waivers or releases of the right to sue the U.S. for winters violations, it's clear that the United States thinks that it is acting as a fiduciary with respect to this. We take all those actions in furtherance of our general trust responsibilities to the Navajo Nation. We of course acknowledge that we have a general trust relationship with all tribes, including the Navajo Nation. But the tribes can't sue you if they think you're not up to task with respect to that. Unless Congress has expressly assumed those duties. And in Mitchell 2, with respect to timber, Congress did. Congress enacted statutes that said not only would the timber be held in trust, but that trust is going to bear the hallmarks of a conventional fiduciary relationship. Didn't our analysis in Mitchell 2 really also focus on the degree to which the government assumed elaborate control over the forest? It wasn't so much just the language of the statute, but the government was acting as though it was controlling the forest in a way that is similar, I think, to what's happening here. Well, the courts made clear in Navajo 2 that control is not enough. And so what was doing the work in Mitchell 2 was that Congress, in the language of the relevant statutes, had recognized this trust relationship and imposed on the government duties to manage the timber in a way for the benefit of the Indians. And that language is just absent from the treaty here. There is no language like the statutes in Mitchell 2 that do for the... If we think this is an APA claim, if we think that what's actually happening is that the tribe is suing the government under 706 for otherwise violating the law under what they perceive to be a fiduciary duty, breach of fiduciary duty, do you lose? No, not at all. I mean, everyone agrees that the APA in Section 702 supplies the applicable waiver of sovereign immunity, but they still need to have some cause of action, some duty... The APA also has a cause of action. That's what I'm asking. If they're relying on the APA's cause of action, not anything analogous to the Tucker Act or anything else, then don't they at least survive the motion to dismiss, and then we can go on to other parts of this litigation? No, for the same reason, because they haven't pointed to any specific duty that would justify that sort of relief. Thank you, Counsel. Ms. McGuire? Mr. Chief Justice, and may it please the Court, I'd like to start out this morning just pointing out briefly two areas of confusion that I've heard on the Court this morning. The first is with respect to Federal Reserved Rights. Justice Barrett, I believe you asked Mr. Liu about the Federal Reserved Claims were brought forward by the Federal Government, and he responded in Arizona versus California that Federal Reserved Right claims were made for five tribes by the Federal Government. That is not quite correct. The Federal Government made Federal Reserved Right claims for 25 reservations. Five of those claims went to the lower Colorado River. Twenty of those claims were to the Little Colorado River and other tributaries of the lower Colorado River system. So the Government clearly in Arizona versus California was acting on behalf of 25 different tribes, making claims to different water sources. Those Federal Reserved Rights are simply rights that then need to be adjudicated. In Arizona versus California, this Court did so with respect to the lower Colorado River and elected not to hear the claims regarding the tributaries of the river. So the Navajos were represented in Arizona versus California like the other 19 tribes, but their claims did not go to the lower Colorado River. You know, I'm not sure that's quite right either. The Federal Government refused to bring a claim on behalf of certain tribes into the lower Colorado, including the Navajo, and this Court said that no adjudication of any tribes other than those expressly discussed in the decree were adjudicated. Right? Thank you, Justice Gorsuch. There was an extensive colloquy with the Special Master with respect to the claims being made by the Federal Government. The Federal Government was not It acted as judge and as well as in its trust obligations. It found it said it didn't have any trust obligations with respect to the Navajo and the lower Colorado, so it didn't bring them. That was its judgment. No, it believed it had trust obligations and it raised claims to the little Colorado River. I'm talking about the lower Colorado, the mainstream, and the Government decided there that it was not going to bring any winner's claim with respect to the Navajo in the mainstream, and so the Navajo have never had an adjudication of their rights with respect to the mainstream. Correct? That is correct. All right. I would welcome the Court's questions. I think we're well into the meat of the discussion here. You were going to make a secondary of confusion. I just want to make sure you get that out. Yes, part of the difficulty when you're talking about Federal Reserve rights is that those rights stem from the Winters decision. It is an implied right. There is no duty that attaches to Winters, and if you look at what the Supreme Court was reviewing when it reached its determination that an implied right to water was created, it never looked at a treaty. It did not look at an agreement. It looked at the Federal Government's actions, so that implied right then needs to be made effective. It's made effective through the adjudication process, either before this Court and the unique nature of the lower there is a second step to effectuating those Federal Reserve rights beyond simply the notion I'm not sure I quite understand that reading of Winters, or maybe I just didn't understand quite what you said, but I mean, Winters is clearly a case about a treaty, correct? No, Your Honor. I mean, Winters says the case as we view it turns on the agreement resulting in creation of Fort Belknap Reservation. You can't say it any more clearly than that. That is true, but there's no mention of water in that treaty. Yes, there isn't a mention of water in the treaty. That's correct. I mean, there's like a page, which is very clear in Winters, which says there's no mention of water in this treaty, but there's a very clear principle about how we interpret Indian treaties, and it so as between these two things, and it goes on a little bit about it's a little bit ambiguous, what does it mean with respect to this water? Did they retain it? Did they cede it? What did they do? And then they said, we refer to this very clear understanding of how we interpret Indian treaties, and that requires that we rule in favor of the Indians here. So it's quite clear that Winters says, you know, there's this way of dealing with Indian treaties, and this is a case about a treaty, and it just doesn't matter that it doesn't say water. I take your point, Justice Kagan, but I think it's important to remember that the actual holding of Winters is we have found that when the federal government sets aside land for, in this case, an Indian reservation, they intended to reserve sufficient water to meet the purpose of the reservation. It is an intent. It does not define a duty for the federal government. That implied reservation of rights is important, but it does not bring an obligation on the federal government to do something more with that implied right to water. Right. Well, I mean, rights usually have a correlative duty attached to them. So what do you take, and this was the conversation that I had with Mr. Liu, which I think is at the heart of this case. So what's the correlative duty that the right that they got from this treaty, which the government admits they got, what is the correlative duty? Justice Kagan, I would say the state petitioners want to make it clear, we do not dispute that they don't have a federal reserve right. What the state petitioners dispute is, what is the race? What is the source of that right that they think they have? They're claiming consistently through 20 years of litigation that that right goes to the lower Colorado River until they come before this court and receive an adjudicated right. So it gives them a federal reserve right, gives them the right to enforce a claim against another party that has claims to the same body of water. But that's an adjudication proceeding. It's not independent based on the federal reserve right alone. Ms. McGuire, did the government's representative, Mr. Liu, say anything during his time with which you disagree? I would disagree on behalf of the state petitioners that it is solely a breach of trust case. I think it's a jurisdictional case, first and foremost, because throughout the 20 years of litigation on this case, there's only been one source of water identified. That's the lower Colorado River. And even with the modified reply that we have before the court today, they say that they're now only looking for the secretary to plan for and assess their water on the reservation in the Arizona portion of that reservation. But that pleading is riddled with references to the lower Colorado River. And no less than a half a dozen times, they say we have unquantified rights to the lower Colorado. If that's what they're after, do the state petitioners have any objection to it? Because it doesn't seem then that it affects you very much if they're not getting the water from the mainstream. It does affect us. The problem is the cloud on title, if you will. As long as any lower court has the potential to issue a ruling that directs the secretary to take an action that manages the system differently than it currently is under what we call the law of the river, there is a risk that the vested right holders with more than 60 years are jeopardized. But I guess what I'm getting at is Judge Lee and his concurrence in the Ninth Circuit said, you know, listen, this can go forward so long as whatever happens doesn't wind up messing with the There are things now that the federal government understands and I'm going to be asking for, which are separate from the mainstream, which are coming up with the plan, figuring out maybe drilling, tapping aquifers, etc. What is the state's interest in that? I guess I don't understand it. That wouldn't really involve the decree. So if there was a way for them to litigate that claim that didn't involve the mainstream, would the states have any objection to that? I mean, what's your interest? Our interest would be simply the fact that this case is at the pleading stage and would be demanded to a lower court and then that court would interpret whatever this court has directed it to do. And it could potentially be issued in order for the secretary to take certain actions that may indeed color the ability of the secretary. I'm not sure I understood the answer that Justice Barrett's question because it seems to me like you're maybe hyping, battling the hypothetical. The hypothetical is, suppose as the government itself concedes there are actions it could take, it would not affect the mainstream at all that would vindicate the Navajos' contract right to water. Assume there is one. What's the state's interest? Your Honor, I would simply not concede that they're only asking— I know that. I know that. But I'm asking you to deal with the hypothetical that I've presented you with rather than fight it. I would agree if you could narrow it to plan and assess. Let me just add one fact, though— No, no. Before you add any facts, can we agree that the states don't have any interest if the mainstream of Colorado is not touched? No, I think the state— Then you need to articulate for us what interest the states have in that scenario. In that scenario, planning and assessment really then, as Mr. Liu indicated, leaves a great deal of room for interpretation. What does it mean to plan? What are you assessing? You're assessing sources of water. You're assessing water demands. The Navajo have access to the Little Colorado, the tributaries and washes on the reservation in Arizona, and groundwater, as he said. Now, if you narrowed it and said you can only assess the needs based on groundwater—and by the way, they've excluded the Little Colorado—that's all you're left with. So it's almost not— Do you have any objection to that? A study of groundwater? No. I do not, Your Honor. Justice Thomas, anything further? In your years of litigating this, has there been a suggestion of any source other than the Lower Colorado? There has not, Your Honor. Justice Alito? Justice Sotomayor? Justice Kagan? Justice Gorsuch? Justice Kavanaugh? Justice Jackson? Can I just clarify one quick thing? This is the same issue. If, hypothetically, the Navajo just said, what we would like is for the federal government to calculate how much water we need per capita. Mr. Liu says we don't know that information. The Navajo is claiming they don't have enough. If that was the world that we're living in, would the state object? The state would not object, but I would say that I think there were serious problems with the enforceability of that. Understood. But would there be jurisdiction under Arizona v. Colorado for a court to entertain a Navajo suit claiming that the government has a responsibility to figure out how much water they need, and it hasn't done so? As long as it was absolutely clear that the decree and the decision in Arizona v. California are completely carved out of any assessments, if any rights to that river are undertaken. Thank you. Thank you, Counsel. Thank you. Mr. Dworawski? Mr. Chief Justice, and may it please the Court. The Senate ratified two treaties with the Navajo Nation. In the 1868 treaty, the United States promised the Navajos a permanent homeland. Both parties understood that in promising the Navajos their land, the United States was also promising them the water it needed to sustain life in the arid Southwest. Those treaties are specific sources of law that give the nation rights to water and impose duties on the government to secure that water. But for years, the United States has failed to fulfill that promise. Today, the average person on the Navajo reservation uses just seven gallons of water a day. The national average is 80 to 100 gallons. The United States agrees that on paper, the nation has treaty rights to the water its people need. We're here because the United States says it doesn't have to do anything to secure the water it promised, even though the United States also says it speaks for the Navajos as trustee of nation's water rights. When the United States blocked the nation from intervening in Arizona v. California, it said, quote, the United States is authorized exclusively to represent the Indian tribes in litigation affecting their property rights, and its actions are, quote, binding upon those tribes. The states say we're here to take their water behind their back. No, the nation is here for its fair share through a fair process. The nation, not the states, was cut out of Arizona v. California by the federal government and left without water. The United States thinks that it alone decides whether it has made good on its promises, but that's not how promises work. A promise is a solemn duty, and the United States' duty is to see that the nation has the water it needs and the United States promised. The nation and its people know and feel the water shortage in the Southwest. The nation asks only that the United States, as trustee, assess its people's plan to meet them in consultation with the nation. I welcome the court's questions. If it were agreed that the only source of water was the lower Colorado, would your argument be the same? It would. As far as jurisdiction? Yes, it would, because the relief that we are seeking here is an assessment of the nation's needs and a plan to meet them. If that assessment ultimately calls for allocating additional water from the lower mainstream of the Colorado, the parties might well, at that point, need to return to this court. But the remedy that we are seeking from the district court does not require reallocating water in a way that would contravene this court's decree. Have you, throughout this litigation, suggested any other source than the lower Colorado? I don't believe we have, but it's also not our burden to do so. The United States has taken on the fiduciary obligation to ensure our winters' rights. The United States itself believes that it holds the winters' rights in trust. The very first step that it needs to take is to assess and figure out its plan for how those winters' rights will be satisfied and met. So it is the United States' duty to figure out where that water ought to come from. But as has been discussed earlier, and as I think Mr. Liu acknowledges, there are other potential sources besides the Colorado, besides the lower mainstream, including the upper mainstream, the Zuni River, the San Juan River. There are other potential pertinent water sources that could supply water to the reservation. Counsel, prior to the execution of the treaty, the Navajo were, of course, forcibly removed from their reservation to an area that they turned out were not able to grow crops on. And then the agreement with General Sherman, they were allowed to move back. Why isn't the permanent home feature a reference to that? In other words, they didn't want, again, to be moved off of their current home. Two points, Mr. Chief Justice. One, I think winters understood that term, which is to include water that is necessary for life as a permanent homeland. But second, to get to the factual premise of your question, when the Navajos returned to a portion of their permanent homeland, they were returning under very different conditions than they had been there before. They would at that point, under the treaties, be under the protection and jurisdiction of the United States. They would no longer have free reign of the territory to be able to access water in the same way that they were before. They would no longer be able to leave the reservation in the same way that they were before. And so the situation had changed and they were dependent on the government for access to water, just as they had been at Bosque Redondo, which was in the unlivable conditions there. The treaty specifically mentions a variety of things that would be necessary for agriculture. You know, the 15,000 sheep, however many cattle, seeds. If the water were, why wasn't the water mentioned as your argument now is it's necessarily implicit, but the other things were spelled out. Wouldn't you have spelled out the water at the time? Well, the other things were spelled out. And as you pointed out, Mr. Chief Justice, the other things were spelled out with numbers. They could be very specifically enumerated in that way. Water was something that was simply inherent in the permanent homeland and making it suitable, both as a permanent homeland and for the very purpose of agriculture. As the court recognized in Winters, if you have a permanent homeland for agriculture, both of which were features of the reservation in Winters as well, if you have those things, you can't carry out the purpose of that agreement without also having water. And so it didn't need to be. No, go ahead, please. It didn't need to be spelled out because it was an essential component of fulfilling the purposes of the agreement. If I understand the government's argument, the government is not contesting that the treaty gives the Navajo Nation water rights. It's simply contesting what the nature of its own responsibility is with respect to those rights. So the question is, you know, what duties attach to the government? And the government is saying the duty that attaches to it is that it can't interfere with the Navajo Nation's water rights, but it has no affirmative obligation to ensure that the Navajo Nation has a supply of water. And it seems to me that that's the difference between the two of you, not, you know, whether the treaty conveys a promise as to water, the government agrees that it does. The government is just saying it has no affirmative duty with respect to the supply of water. So what's your answer to that? Justice Kagan, I think the government's conduct, both in Arizona versus California, and in other cases, belies the notion that the treaty just gives the tribe a stick and a bundle to do with as it wishes. The government itself, its own conduct shows that it believes it has affirmative duties. In Arizona versus California, the United States said that it spoke for the nation. More recently, in a January 2022 intervention motion in New Mexico litigation, the government said again, quote, the United States is the legal owner of all water rights recognized for the Navajo Nation, holding these rights in trust for the Navajo Nation. So the United States is controlling these winters rights. And in certain instances, like Arizona versus California, blocking the nation from asserting those rights for itself. So the United States, this is not a situation where the United States simply gave the nation a stick and said, here you go, use it. The United States continues to exercise control over that stick. And in doing so, the United States itself is recognizing that it has duties with respect to the water. It seems to me like winter's rights are something different than tapping aquifers and helping come up with a plan or helping install pumps. I mean, are you are you arguing for those latter kinds of duties or just for winter's rights? There will be a different claim to say we have winter's rights and the government hasn't been asserting them on our behalf. They breach their trust obligation by blocking our intervention. That's a different kind of claim. That's right. So let me be clear about what I think the scope of the winter's is. The scope of the winter's rights include access to sufficient water from a pertinent water sources, either within or along the border of the reservation. The United States has to ensure that access. We are not saying as a matter of treaty interpretation that the United States is legally obligated to pay for pipelines or aquifers or whatever that whether the United States has a moral or political obligation to do that, as Mr. Liu acknowledged. I think it does. But in terms of the winter's rights under the treaty, that is really a right of access to an appurtenant water source. So that's really just about intervening in litigation to assert those on the Navajo's behalf and to protect them, right? Like to safeguard those rights so that you're not deprived of them. As Justice Gorsuch was pointing out, the Navajo haven't had an opportunity in to have any rights in the mainstream adjudicated. I think that's right. Putting aside here the whole question of the decree and whether you're trying to get rights to the mainstream, let's just take that part off the table. But really one way to think about the breach of trust here, just to make sure that I'm clear, is that the United States failed to assert winter's rights on your behalf and in fact blocked you from watching out for yourself. That's right. I was going to emphasize the last part. Not only failed to assert, but in fact put us in a catch-22 by keeping us out of the Arizona versus California. Why wouldn't you try to intervene in that litigation now? I think there would be very significant obstacles to doing that without the United States support, including that the states would assert sovereign immunity objections that the United States could overcome, query whether the nation could overcome those on its own. And the United States is not the litigation that we were blocked out of. Doesn't the failure to assert also carry with it an obligation to evaluate to the extent that the government is claiming that it doesn't assert because it didn't think that you had or needs for water or whatnot. So I don't know that it's as narrow as just they breach the fiduciary obligation of not asserting, but they also have to figure out the circumstances under which assertion is required. Of course, Justice Jackson. And I think that the key first step in figuring out what claims to assert is assessing what are the needs and how are those needs going to be met? And so a breach of fiduciary duty claim could rest on the Navajos claiming you haven't even done the legwork to determine whether or not to assert our rights. Absolutely. And the breach of fiduciary duty in that situation would be analogous to a failure to provide an accounting of what's in the trust. Before you can figure out how to actually manage the trust, whether to assert the winter's rights in litigation, you have to figure out what is in the trust and what the needs of the trustee are. When I look at the relief that you are requesting, I don't see anything about the original action. You're now saying the breach of trust occurred as a result of actions that the United States took in the original action. But the relief that you're now requesting here doesn't have anything to do with your ability to attempt to intervene in that action. Is that correct? Well, Justice Alito, I think the breach is a continuing breach of failing at a minimum to the United States conduct in Arizona versus California is one element of that breach. It's not the only one. As I say, it's an ongoing breach not to have remedied what happened in Arizona versus California. I was just going to say, I think it might be helpful to the court to understand in a little bit more detail what actually happened in Arizona versus California. I'm not interested right now in Arizona versus California. Of course, it's important, but I'm interested in the relief that you're asking for. Now, you want a plan. If all you got was a plan, that wouldn't do you any good, would it? The plan would then need to be implemented. Yeah, okay. You say you want the United States to, quote, exercise their authorities in a manner that does not interfere with the plan to secure the water needed by the Navajo Nation. So, you may have structured your... You may have used words in describing your relief that doesn't require the allocation of water from the Colorado River, but in the end, that's really what you want, isn't it? Do you deny that? Well, I think it depends. As Mr. Liu acknowledged, there may be other sources of water. And so, I think it depends what the assessment and the plan show. If the assessment and the plan show that the nation does need water from the lower mainstream, as it very well might, I don't want to fight on that point, then at that point, the decree would need to be reopened. But we're not at that point, and we don't know that at this stage. So, you've studied the problem. Is there any realistic possibility that you can get the water that you think that you need from sources other than the Colorado River? I think it is very likely that some water from the lower mainstream would ultimately be needed, but the process of conducting the assessment and coming up with the plan show that, and we're simply not at that stage. And that, of course, is what Judge Liu recognized in concurring in the Ninth Circuit and why he would allow this case to go forward. You mentioned the small amount of water used per household on the reservation. Do you know the percentage of the total water that is available to the Navajo Nation that is used for household use and the percentage that is used for agricultural use? I don't have that percentage, Justice Alito. If you take all of the water that the Navajo Nation now has and divide it by the number of residents, do you know the per capita amount of water, which could be quite different from household use? I don't have the per capita. And on your earlier question, I think that the agricultural uses would far dwarf household uses, but I don't have the particular number on that. Justice Alito, in response, if I could, to questions that you were asking earlier today, if you look at the Dig Deep Right to Water amicus brief, it gives statistics about the per capita use on the nation versus neighboring states. And those statistics come from a U.S. geological survey study. The average American uses 88 to 100 gallons a day. In the particular states that you were asking about, New Mexico is 81. Utah is 169. Arizona is 146. And again, on the Navajo Nation, the Navajo Nation is about seven gallons. Yeah, but that's use, right? That's not per capita water. It's how much is used by the household. A state could have an enormous amount of water and use, well, could have a certain amount of water and use a very high It could. I can tell you that as a practical matter, the Navajo Nation has a water shortage for all purposes. The reality on the ground is not that there are sprinkler systems irrigating while people are driving miles to wells in order to get water to be able to wash their hands or do their dishes. That's just not the reality. Is there anything special about this entered into with other tribes? I think each treaty, as a matter of treaty interpretation, has to be looked at in light of its history and context. And the particular history of the Navajos, as the Chief Justice recounted earlier, the particular history of the Navajos informs the interpretation here in a way that may or may not apply for other treaties. In terms of the permanent homeland language is something that is found in other treaties as well. But not all tribes are similarly situated to the Navajos in terms of either their history or their location. Some tribes may have sufficient water. Not all tribes have unadjudicated water rights in the way that the Navajos do. And so I can't give you a categorical answer other than to say that the analysis has to go treaty by treaty. If we said that the language in the treaty regarding a what would you point to to take you over the line? Permanent homeland plus the agriculture provisions, both of which are similar to winters, which I think has to inform how this court reads those terms, but also the negotiations and the historical context and the context of the reservation today. The climate is particularly arid. As I explained to the Chief Justice earlier, when the Navajos are returning to a portion of their original homeland, they were confined to only a portion of the reservation without the same access that they had had before to be able to get water for themselves. They were returning under the government's protection. All that context is an important tool of treaty construction. And in order to carry out the purpose of this treaty, it has to be read to include these promises of water. What other obligations are there in the phrase permanent home in addition to providing water? I think really it's just the land and the water that are inherent in the term permanent homeland. And again, that comes from this court's opinion in winters. Water is particularly important for life in a way that this court recognized. It's a unique resource. It is not one, again, that the Navajos can simply access on their own. So you can't think of anything else beyond water, beyond the land, I guess, and the associated water that would be an implicit requirement in the permanent home? Not, I think, that comes just from that language. There may, of course, be other breach of treaty or breach of trust claims that could be brought. I don't mean to suggest that water is the only type of claim that could ever be brought. But in terms of what that particular language is understood to mean, I think in light of winters and the particular importance of water for carrying out the reservation's purposes, that is really the key element there. In response to earlier questions, I think from Justice Kagan, I believe you said that the U.S. can't interfere with the Navajos' access, is your word, to sufficient water. But you said that you were not saying that the U.S. has a duty to construct infrastructure, build pipelines, what it's like. Just want to make sure I have that correct. So I think on the first part, it's more than just not interfering with the access to water. The United States does have an affirmative duty, particularly since the United States believes that it holds these waters' rights in trust. It has an affirmative duty to ensure that the Navajos have access to the water. Okay. And how... Keep going. Well, and that may well require, as I explained to Justice Barrett, that may well require litigating on behalf of the Navajos, or at a minimum, allowing them to litigate on behalf of themselves rather than taking the position the United States has taken, which is that it alone speaks for the Navajos. Once the United States has assured access to the water, it does not, as a matter of the treaty, have obligations to build pipelines across the reservation or that sort of thing. The winters' rights are about access to the pertinent water source. What is ensuring access to the waters entail, then, or encompass, potentially? Well, at a minimum, I think it requires, in a litigation context, ensuring that water is allocated to the Navajos, that the Navajos have the legal right to the water, which... How about at a maximum? Which is what could have happened in Arizona versus California. Beyond that, I think the nation... The United States does have an obligation to make sure that the water is accessible. So, for example... What does that mean? Well, you couldn't, for example, get a court to decree that the Navajos have a legal right to certain water, but then the United States puts up a dam and blocks the Navajos from accessing that water. It has to make sure that it is actually accessible, but it doesn't have to build infrastructure to make that happen. I hate to be stuck on the same question, Mr. Dvoretsky, but between these two positions, which is Mr. Liu's position, is that you have a right and they have a duty... They have a duty not to interfere with your water, as opposed to they have a duty to ensure access to your water. Both of those are not spelled out in the contract. Both of those are implied rights and duties. So, how do we choose between them? I think you choose between them based on... First of all, based on the recognition that Winters has that water is essential to life and to the purpose of the treaty. Second, based on the understanding of the contracting parties... But do you think... I mean, I agree that Winters is about a treaty and says water is really important, but do you think Winters actually says the government in one of these kinds of treaties is obligated to ensure access to water? I'm not sure Winters gets you all the way there on that. I don't think Winters says that because that wasn't the issue in Winters, but that wasn't the issue in Winters. However, the right to water would be meaningless if the government, as trustee, doesn't also have an affirmative duty as the trustee to ensure that water is available to the beneficiary of the trust. It would be one thing if we were in a situation where the Navajos could engage in full self-help as both a practical and a legal matter. They could simply access the water for themselves. That would be one thing. That's not the situation here, though, where the United States affirmatively says that it controls these Winters rights. It is the trustee. And so the United States seems to recognize itself that it has some duties. And as a practical matter, that puts the Navajos in an impossible situation if the United States, on the one hand, says, we control these water rights. We can block you from asserting them for yourself. Maybe you can intervene permissively, but you have no intervention as of right. And if we come in, we take over the litigation. That's the position the United States takes, not only in Arizona versus California, but as recently as last year in litigation involving the Navajos. That's putting the Navajos in an impossible position so that, to answer your question, Justice Kagan, if you're choosing between the two competing views of this case, you ought to choose the view that reflects both the understanding of the tribe at the time, and treaty interpretation favors the understanding of the Indians. I was just going to ask you, what if you had intervened in Arizona versus California, or if the United States had asserted the Winters rights on your behalf and it still wasn't enough? So let's say that the special master and the decree that we entered doesn't give you anything close to the 80 gallons a day, say, that you might need. What's the United States obligation then? It still has an obligation to do an assessment and a plan to see if there are other sources of water. And there's not. Let's just say it would be very expensive. You have rights to the mainstream. It's not enough. You have some rights to the tributaries, but it's still not enough. But there is something in an aquifer or groundwater that would require building pipes, et cetera, and the Navajo doesn't have the resources to do it. Does the United States have an obligation to get you the water you need? I don't think there would be a legal obligation there. The Winters rights, again, are about pertinent water sources. And at a certain point, as a practical matter, if those dry up, if they're simply not available to supply the Navajo's water needs, the United States can't... So this is all about the Winters rights. I'm just clear. I didn't understand that before. So this has been helpful. This really is like what you're asserting the obligation is about the Winters rights. That's right. Can I ask you, are you bringing this lawsuit under the Tucker Act? No, we are not. And so you're not relying on the Tucker Act waiver of sovereign immunity for the claims that you're bringing in this case? We're relying on the waiver of sovereign relief of the APA. Yes. All right. So do you... I guess I understand that you say that the treaty does give a positive source of rights and that's all in your brief and that's what we're arguing here today. But do we really need it if you're bringing this claim under the APA? Well, I don't think... We're not bringing an APA cause of action, to be clear. We're under the common law breach of trust and the ninth circuit also granted us leave to amend on remand, if we wish, to assert a breach of treaty claim as well. I know Justice Barrett had some earlier questions about the difference between those two causes of action. All right. So focusing in on the breach of trust, do we have to find that... I mean, the United States is taking the position that you failed to state a claim for that. We're at the motion to dismiss stage because you haven't identified a positive source of law. So I guess I didn't understand that you would have to if you're just bringing a breach of trust claim. Well, I think there still... There has to be a source of law that we would point to for where the rights and duties come from. I think that much... Could it be something like the practices of the United States with respect to their acting as a fiduciary, controlling these rights? Could that be something that you look to as the duty? I mean, I had this feeling throughout the whole case, in a way, about kind of like common law estoppel kinds of principles. To the extent that the United States says we have a trust obligation and is acting as a trustee, why isn't that enough for someone who claims to be a beneficiary to say, hey, we can sue you for not doing all that you're supposed to do in your role as trustee? So I think you could. I think our case is stronger than that because I think that the United States conduct shows that the United States itself understood that arising out of the treaties, which are the first source of law that we point to, that the United States had... Right. So you have the treaties too, but I guess to the extent that there are people and the United States is arguing that the treaties actually don't have an express requirement or a duty, I guess one might also say, well, you've been acting as a trustee. You admit you've been acting as a trustee and why isn't that enough to be the basis of the breach of duty claim that we're trying to bring here? That's right, Justice Jackson. Counsel, Justice Kavanaugh asked the question earlier that you're not defending the Ninth Circuit decision. Could you succinctly point out why you're not, or if you are, why he's wrong and explain how your position differs from the Ninth Circuit, if it does? Yes, Justice Sotomayor, we are defending the Ninth Circuit's decision. The core of the Ninth Circuit's analysis was correct. The United States said that even under the Hickory standard, identifying a specific source of law, the tribe has pointed to the treaties and that the treaties properly understood in light of winters and in light of the agricultural provisions and in light all of the canons of construction that apply to Indian treaties, those create the rights and duties that we're seeking to enforce. That was the heart of the Ninth Circuit's analysis, and we are defending that. The Ninth Circuit also recognized that, and I'll just quote here, the Supreme Court could not have intended to hamstring the winters doctrine, which has remained good law for more than 100 years, by preventing tribes from seeking vindication of water rights by the federal government when the government has failed to discharge its duties as trustee. That's it. The government's Petition Appendix 32A, the previous analysis that I was pointing to was at the government's Petition Appendix 25A to 26A. So we are defending the Ninth Circuit's analysis. Justice Thomas? So you are arguing in much the posture that took place that there's a pre-existing right to water that is already there? That's right. These are reserved water rights reserving for the tribe, reserving the tribe's pre-existing water rights. Justice Alito? I'm still not sure I understand exactly what you mean by access to water on the ground. In response to a lot of questions about Navajo Nation to engage in certain litigation, but put all that aside and talk about what access means on the ground, so to speak. Does it ever require the government to construct any infrastructure? I can't say that it would never require any infrastructure whatsoever. It would depend on what the situation is. If you had a situation where you had an impertinent water source, and the tribe had an allocation of water from that water source. But as a practical matter, there was simply no way to actually reach it, even though it was an impertinent water source. Perhaps in that situation, the government would have some obligation in order to ensure access through an impenetrable wall or something like that. But I also think that the government hypothesizes a parade of horribles, where the government would have to be building pipelines across miles and miles and miles of territory. We're not talking about anything like that. We're talking about ensuring access to impertinent water sources. Well, if the reservation is here, and the Colorado River is down here, you have a cliff that's hundreds of feet high. Do you think access means that the government has to create, has to construct whatever facility is to get the water up the cliff? I think it probably would not have to construct that, although certainly if there were any settlement negotiations, that's something that could and very well might be provided for. If you could access a water source on your own, or with whatever assistance you think the government has to provide you with, how much water do you think you are entitled to extract from that water source? What does access mean in that respect? Does it mean a right to take out as much water as the Navajo Nation thinks it needs? Well, I think this goes back to the question of the assessment that the United States has never conducted. And so we don't know the quantity of water, and it's not necessarily how much we think we need. All right, how much do you actually need to transform the reservation into a permanent homeland, a livable permanent homeland? I think the nation has a right to access up to that point from impertinent water sources. Going back to Justice Barrett's earlier question, if it's impossible, we're not suggesting that can be manufactured from nowhere, or that it has to be trucked from the Great Lakes. But if you can access it, let's say you could access it yourself, and you're not even asking the government to provide any infrastructure, do you think that you have the right to take out from that water source whatever quantity of water is necessary to meet the standard of a livable permanent homeland, regardless of the needs of others who are drawing water from the water source? So whatever right we have would, of course, be subject to, in an adjudication, what is allocated to us, which may be something short of that. But the nation had water rights first. We do have priority rights to the water, and that's something that ought to be considered as part of an adjudication. Well, when an allocation is being made, and you assert we have the right under federal law, under the federal treaty, to take out as much water as we need to make the reservation a livable permanent homeland, you say we have that right that supersedes other rights, it supersedes any rights that the states may have. Is that your position? You have that priority, and other users of the water simply have to accept that, no matter what the consequences for them? I think, as a practical matter, the way this would work is that there would likely be some sort of a negotiated resolution. We would like to have a seat at the table to be a part of that, which we've been cut out from. But in terms of figuring out what the needs are also, it's not just whatever we might want. There are judicially accepted methodologies for assessing what the water needs of a tribe are. The Arizona Supreme Court has a multi-factor test that it's discord in Arizona versus California used a different methodology. There are ways of assessing this. The idea is not just that we get to say what we want and take it. That's not how this works in practice. Justice Sotomayor? No, thank you. He answered my question. Justice Kagan? You said earlier that you had some things to say about Arizona v. California and the nature of what happened there. Have you gotten that out? I haven't. Thank you, Justice Kagan. Just to explain something about what happened there that I think is relevant for the court's context, the reservation is adjacent to a stretch of the Colorado in northern Arizona that is upstream from Lake Mead. In 1960, the special master decided that only mainstream water in and downstream from Lake Mead was at issue. And so the portion of the Colorado that was adjacent to the reservation, according to the special master at first, was not at issue. The nation moved to intervene and argued that if the court rejected the special master's recommendation and apportioned mainstream Colorado water upstream of Lake Mead, the nation's interest would be affected and the United States wouldn't adequately represent them. This court, of course, denied intervention. And the United States, in opposing the motion, actually agreed that if the court did decide to apportion water upstream from Lake Mead, it would then, and this is at page 15 from the government's intervention opposition, it will then be necessary to determine the appropriateness of an application under Article 9 for adjudication of the nation's rights. That never happened after the court rejected the special master's conclusion about Lake Mead. And so this court ended up adjudicating rights upstream from Lake Mead that affected the portion of the Colorado adjacent to the reservation, but the United States never followed up and did what it said it would do, which is to figure out whether at that point the nation's interests would be affected, which in fact they were. Do we know why? Why they never did that? I don't. Justice Gorsuch? Justice Kavanaugh? Two things. First, on the Ninth Circuit, I take your point about the treaty, but I just want to make sure the parts that you're not defending of the Ninth Circuit, you took the position that the court's breach of trust decisions were applicable only to claims seeking money damages. You persuaded the Ninth Circuit of that. You're no longer defending that, correct? I think that's right insofar as we need, I think we need to and have shown a specific source of law that it creates rights and imposes duties. That's the standard that has to be met. And then in the Ninth Circuit, you also relied on various statutes and environmental impact statement. You're no longer relying on those, correct? We haven't relied, we haven't made our argument based on those. That's a yes. Yes, we are no longer, we are not affirmatively relying on them. I am not. Okay. That's all I want to reject. That's all I wanted to make clear. You're not relying on various arguments that you persuaded the Ninth Circuit on. You are relying on the treaty and the winners. We are relying on what we believe is the core of the Ninth Circuit's analysis, which was correct. Okay. And then a big part of the Solicitor General's position seems to be at a big picture level, leave it to Congress, that the courts lack the authority, arguably from their perspective, also the competence, arguably from their perspective to sort all these competing interests out in Arizona in a way that's going to be fair and equitable. And that Congress has shown the ability to do this with other tribes and other reservations and that rather than a multi-year journey here, where really it's not clear you can ever get what you really want out of the court system, as we've danced around today, we should leave it to Congress. So that's, I think they're, DeRionne, I just want to get your response to that. First, the relevant action by Congress is ratifying the treaties and the treaties properly understood, as I've argued today. Congress now, Congress now, leave it to Congress now. It shouldn't be left to Congress now because Congress now, like Congress then, is seen to have agreed to these treaties. It of course is possible for us to get the relief that we want out of the judicial system. We can get the plan and the assessment and the plan will either provide for water sources other than the Colorado and can be implemented, or if it's at that point, the parties can return to this court and get that relief. So it is possible to get relief from the court. And then third, as a practical matter, the government says, leave it to Congress, leave it to the political branches. We've been waiting half a century since the mistake that I explained to Justice Kagan in the Arizona versus California litigation. We've been waiting half a century for the political branches to solve this problem for the nation. It hasn't happened. Thank you. Justice Barrett. Quick, I'm kind of stuck in the same place as Justice Alito. You just said in response to Justice Kavanaugh, you know, plan and assess, we haven't had that yet. So let's say plan and assess shows, yeah, you know, we can't get everything we need from the mainstream Colorado River, even assuming you had winter's rights. Is it just, thanks for the plan, thanks for your help with the assessment, United States, we'll take it from here? Um, once we get the plan, the plan itself might be judicially reviewable, or would be judicially reviewable. But we're simply, we're simply not at that point. But I know you keep saying that, but like, I guess what I'm, you know, Justice Alito asks, so does this involve infrastructure? Does this involve pipelines? And that's a different thing than just, hey, help us figure out what our needs are. So we have a plan and assessment, and then maybe we can be part of the Arizona versus California litigation and assert winter's rights. But you're not saying any of that, you're just saying, we just need the plan and the assessment. And then thanks, we'll take it from there. And maybe we can intervene in Arizona versus California. No, I'm saying that in this litigation, we are seeking the plan and the assessment, which is like an accounting and a common law trust action. Once we have the plan and the assessment, hopefully the United States would simply implement the plan. And if the plan calls for reopening the decree, then they would seek to have that happen. If we're dissatisfied with the plan, that might be a separate breach of trust or potentially breach of treaty claim. But it's possible that the plan might require some sort of infrastructure, pipe, et cetera. It is possible that the United States would include such things in the plan, whether, whether if the question is whether we could go to court and say the plan is deficient because it doesn't include pipes running across the reservation. I don't think the plan calls for pipes. The United States has to provide them. Is that what you mean by judicially enforceable plan? It's just a different thing. If what you want is the ability to assert winter's rights to the mainstream. I think this is some of what justice Alito is getting at. That's just a different thing than saying our enforceable treaty obligation is that the United States helps us plan, assess pipelines, infrastructure. And at some point you've said that's not what you're asking. But then it seems like maybe it is what you're asking. I think it's not what we're asking. We are asking for the United States to ensure that there is adequate water available. I think that that invokes the wind that is meant to invoke the winter's rights. Right now, there is no water even to pipe. That is what we are asking them to assess. How much water do we need and how is it going to be made available, but not how is it going to be piped across the reservation. Right now, there's simply no water to pipe. Justice Jackson? I guess some of my confusion about the questions about how much water the Indians have now on the reservation and the sort of details and contours of the U.S.'s is the fact that I thought this was at the motion to dismiss stage and that you've claimed that they have breached a fiduciary duty to ensure that there's access to water. And at some level, we have to, I guess, assume the truth of that for the purpose of evaluating the government's argument, which is that we can't even go forward to litigate whether there's a breach in this case because you have to point to a particular express duty and you haven't done so. I sort of felt like that's where we were and so help me to understand the relevance at this stage of arguments about whether or not there's actually been a breach, whether or not the Navajo really have enough water, all of that. Should we be thinking about that right now with respect to where we are in litigation? No, Justice Jackson. This litigation is at the point where we have not even been allowed to amend the complaint in order to assert the breach of trust claim or a breach of treaty claim as to the United States conduct. All that needs to happen at this point is that we ought to be allowed to amend the complaint and go forward with the litigation. The precise scope of the Navajo could still lose later on in the litigation, right? I mean, if you amend the complaint and the complaint goes forward because it is not precluded in so far as you haven't done some sort of identification of the positive duty or whatever, we go on and then there's discovery and litigation about the degree to which the United States has or has not breached its obligation and it's possible that the Navajo would lose. It's always possible. I hope not, but it's always possible. I'm just saying the decision that we're making right now is not on the merits of whether or not the Navajo is correct about the United States having breached its duty. That's right. The only question at this point is whether we ought to be allowed to amend our complaint or whether it was futile for us to do so, to try to do so. Thank you. Thank you, Counsel. Mr. Liu, rebuttal. Thank you, Mr. Chief Justice. Just a few quick points. First, about the Winters decision. We read that decision as having basically two parts. One part of it is about the scope of the reservation that's granted to the Indians. That scope of reservation includes water. My friend described it as access to water. Justice Kagan, you asked, that seems different from how we're describing it. It is, and we're correct for two reasons. Look at the nature of the right with respect to the land that's reserved under that reservation. There are no ensure access to land, build roads, build bridges, as the land. There's no such duties with respect to the minerals, no such duties with respect to the timber. So if you compare the water to those other things that also come with the same bundle of sticks, we're right about what right is being conveyed. Also compare the Winters doctrine, not just in the Indian context, but to every other context it applies, not just to Indian reservations, but to national monuments, national parks, national refuge areas. In all of those other instances, this is a doctrine of reserved rights, rights against interference, rights to use, rights to exclude. In none of those situations is it an affirmative duty. There's a second part of the Winters case. That's where the Indian canons come in. The Indian canons came in to construe the session of land that was at issue in that agreement. That agreement took the Indian's land, they seeded a lot of it, kept some of it. The question was, when they seeded a lot of it, did they seed the water with it? The Indian canon came in to construe that session and the answer was no, they didn't seed it with it. Because Winters can't be doing all the work, my friend needs to point to something outside Winters as a source of this duty. It can't be Winters itself. So what do they point to? It's the treaty. The treaty doesn't do the work for it. We agree water is implicit in one part of the treaty. It's Article 2 of the treaty that makes the reservation. We do not think water is implicit in all the other agricultural provisions. No one thinks seeds means water. No one thinks agricultural implements means water. Seeds means seeds and agricultural implements mean agricultural implements. So the treaty doesn't support them. This idea that we at least have a duty to do some sort of common law trust accounting is contrary to this court's cases that say you can't import those common law duties until the tribe has gone through the threshold step of establishing a duty in a statute, treaty, or regulation. And so while those duties might make sense if the government were a conventional fiduciary, they don't make sense when Congress is in the driver's seat and can decide how to shape the contours of the trust relationship. I think my friend said if the tribe can engage in full self-help, then there's no claim here. Well, the tribe can engage in full self-help. It can fund its own infrastructure projects. It can tap the groundwater on the reservation today. There's no impediment. It can assert its own Winters claims. I see my time is up. Thank you, counsel. The case is submitted.